et al. Oral argument not to exceed 15 minutes per side. John Edwin Moran for the appellant. Good morning, your honors. May it please the court, my name is John Moran and I am the attorney for the appellant. At this time I would like, with the court's permission, to reserve three minutes for rebuttal. You may. Your honors, Mr. Voltz asked this court to grant a summary judgment in favor of appellees. The district court in this case was blinded by the severity of the accusations underlying this case against Mr. Voltz, and as a result committed several serious errors. First, it determined that the cat's paw theory of liability could not be applied to the HR director of Erie County, Margaret Rudolph. She wasn't on the board, right? She was not on the board. No, she was not, your honor. But she was the, what, supervisor? She was the director of the HR department. She was over him? She was parallel to him. Mr. Voltz was a director of the job and family services department, and Margaret Rudolph was the director of the HR department. Those were separate departments within the scope. She was an operational person. She's the HR person for the whole county or whatever. I suppose that's one way to put it, your honor. Yeah, they're both under the scope of the Erie County Board of Commissioners. What you're saying is that the board just deferred to her? That's exactly what I'm saying, your honor. I'm saying that the cat's paw theory of liability is applicable when a biased supervisor commits a discriminatory act that is intended to cause and is, in fact, a proximate cause of an adverse employment action. That's the rule enunciated in Stout v. Proctor Hospital. And what you call the discriminatory act here is discussing this with the board? It's her recommendation of termination to the board, as well as her failure to recommend any other potential action that was available under the Erie County policies. Is this the only thing the court below says about this is, and it says on page 13 of the district court opinion, further, Rudolph was part of the hiring committee that recommended the board hire plaintiff. It defies logic for Rudolph to recommend plaintiff be hired and then one month later recommend he be fired because he is male and Hispanic. The cat's paw theory has no application here. That was the district court's explanation that it's strange in this world if she all of a sudden developed a discriminatory attitude toward him within a month. Well, I guess I have a couple reactions to that. The first, is that the paragraph from which you're reading, I think right before the section you read, also notes that Mr. Volz was not under the direct supervision of Ms. Rudolph. He was under the direct supervision of the board. So that's the first ground that the district court cited for why cat's paw is not applicable. The second ground is Ms. Rudolph's supposed support for Mr. Volz throughout his career, including this appointment to the director position that preceded his record evidence in this case, doesn't bear out that conclusion at all. At best, there's a genuine issue of fact as to whether or not Ms. Rudolph was supportive of Mr. Volz's appointment to the director position. It is true, isn't it, that most cat's paw cases, and I've been on some of these, for example, you have a police hierarchy and somebody who was the supervisor and has a history of run-ins with a subordinate then recommends and the police chief does the firing. Isn't that the more usual case? Well, and that's precisely what happened here, your honor, yes. I mean, well, but he isn't, she, number one, she isn't the supervisor, but number two, what's your history of discriminatory animus and that is what the recent hiring and so on undercuts to some degree. I do see what you're saying, your honor. I guess, I'm not sure if there's a prototypical cat's paw set of facts, but in the Chapman v. Toho 10x America case, which is a recent Sixth Circuit case decided after Stow, the Sixth Circuit applied the cat's paw theory of liability to an HR director that was not the plaintiff's direct supervisor because that HR director had a position of influence with respect to personnel action. So it's not so much about whether or not the person, the biased supervisor, was directly supervising that particular employee. It's more about whether or not they are a supervisor in terms of their agency and scope of employment. What is the evidence that she was previously biased against him because of his Hispanic origin and because he's a male or both? Well, that's a good question, your honor. Mr. Volz testified in his deposition that he had a lot of communication problems with Ms. Rudolph. That alone couldn't necessarily warrant a finding that it was based on his protected... That's very unspecific. But he did testify that after the anonymous complaint that was filed with the Erie County Board of Commissioners in 2011 was investigated and he was cleared of all as the building, meaning the Department of Job and Family Services, was full of estrogen and as a male he was not going to survive. She then... That was supposed to be her words? Yes, correct. She then criticized the same command presence in writing. That statement was before he was chosen as director, is that correct? Correct. And when Ms. Rudolph was deposed in this case, she was asked specifically to describe what her role was on this committee that ultimately recommended that Mr. Volz replace Judy Engelhardt as the director of the department. And her characterization of her involvement was that she was mostly the facilitator. She asked a couple questions from a set script. So when Ms. Rudolph... What? She asked a couple questions from a set script, but she was mostly the facilitator. So when Ms. Rudolph was asked to describe her role in this supposed support, she said that she was just the facilitator. She organized the... She scheduled the meetings, etc., but she was not... Vote or make a recommendation of the committee? This committee collectively. The testimony shows that the committee... She was a member of. She was a member of it, but when she was asked specifically to describe her role, she said she was mostly the facilitator. With respect to the ultimate firing, was she the only one that made a recommendation, or was that a group also? Her recommendation is the only one that's in the record. Erie County Administrator Mike Bixler, he's no longer with the county, so I should say former administrator, he was present at the meeting. The Erie County Sheriff, Terry Lyons, no longer there, but he was present at the meeting. But neither of them remember offering any sort of specific recommendation to the board. But this was a meeting with a bunch of people. It wasn't like she sent a piece of paper and somebody stamped the piece of paper. That's true, your honor, but the meeting with the board... The board, are they elected? I mean, they're the political honchos for the whole county. Correct. Right. That's correct. And so they... For better or worse, they know they have an issue. Well... It's not rubber stamping something, is it? Well, I think that it is, actually, because Commissioner Monahan, who was the president of the board, his testimony was that he relies on Margaret Rudolph to make these recommendations and apply the Erie County personnel policies. That was his testimony. I think if you look at his deposition, he likens himself to a CEO, and he designates these sort of responsibilities in terms of deciding what to do to lower level employees like the HR director. Commissioner Tom Farrell's testimony was very clear. He said, when asked about the termination meeting, he said, I believe Margaret was there, and she explained to us that Mr. Volz was a probationary employee. He wasn't available to perform his duties as the head of the Department of Human Services, which is a precursor to Job and Family Services. And that he was incarcerated, and we didn't know when he was getting out, and it was probably the best option for us to terminate him. A lot of folks that were involved in this termination meeting can't remember precisely what was said, but there are notes of the meeting in the record, and the notes show that this meeting lasted no more than 10 minutes, and that it was convened, Margaret Rudolph had a recommendation, a pre-separation or pre-disciplinary conference was considered and rejected, which is a clear violation of Erie County personnel policy, and instead he was removed and replaced with a white female. Okay, but this litigation is only on the discrimination claim, it's not a Section 1983 Loudermill kind of thing. That's true, Your Honor. Good, I just want to be clear. Who, as I understood, you raised the prior investigation that he was cleared on in terms of internal harassment. As I recall the record, there was, in effect, a sit-down saying, okay, you're cleared, but you better keep your nose clean, henceforth. Who was in that meeting and committee? Well, there's a lot of conflicting testimony on this point, Your Honor, and I believe it's one of the many reasons that we have genuine issues of fact. Mr. Volt remembers this meeting as simply one in which he was told that he would be cleared of wrongdoing. I believe the commissioners were involved, and Margaret Rudolph and Mike Bixler. Okay. Judy Englehart may have been there. Okay, but it was a kind of, we won't call them a committee, but it was a group of people. It was a group of people, that's right, but the issue of what sort of warning was communicated to him has been greatly embellished by the defendants in this case. Mr. Volt remembers nothing more than Commissioner Shenago telling him to be more like him, settle down with a family. At the time, Mr. Volt was unmarried, he's still unmarried, and Mr. Volt didn't think that there was much to this. The defendants are now trying to recast this as a warning that nothing, no further issues could arise in his employment, which is the same issue of whether or not a warning occurred arises later on when he's appointed as director. He's given the job and defendants are now saying that he was warned at this point that he was to have no issues, even though they were giving him this vote of confidence in a promotion. But Mr. Volt's testimony is that he met with the commissioners, he was offered the job, he then had a meeting with Margaret Rudolph and Mike Bixler and was told it was about the formality of accepting the job and what his pay would be. Commissioner Monaghan says that he told Margaret Rudolph and Mike Bixler to communicate some sort of warning, but Margaret Rudolph and Mike Bixler don't remember doing this. Bixler is the county administrator, he's the... Correct, he's the, he was the county administrator for 35 years, he's no longer there. He's the top bureaucrat under the political people. That's correct, your honor. So the interesting piece about this is that Margaret Rudolph does remember precisely what was communicated at this meeting, and Margaret Rudolph said that she told Mr. Volt to be careful about socializing with subordinates, because he was now going to be the director of the department and it's more difficult to discipline your subordinates when you socialize with them. That has nothing to do with the actions that are underlying this case. So to constrain... What did she say herself about the statement that you read earlier about testosterone? Estrogen. What did she say about it? It was she, that's what she, she conceded that that's what she said. I can't remember exactly what she said in response to that, your honor. I know that she acknowledged that she wrote that Mr. Volt had a command presence in the written report as a result. The words that you, you won't survive, which was at least what you quoted, you don't know how she responded or if she was even deposed on that? I don't believe she was deposed on that specific issue, your honor. All right, you'll have your time for rebuttal. Thank you. May it please the court. My name is Mark Fischall. I'm here to represent the appellees in this case. I guess I want to deviate from what I intended to talk about and talk about a couple of the questions you asked Mr. Volt's attorney. So there's this discussion that you, you asked Mr. Volt's attorney about this conversation that occurred. Now a conversation did occur before he was, at the time he was promoted to director, but before he actually took the position. But, and frankly, and I'm quoting here from Pat Shenago's deposition on page 33. He says, what I was upset about, I'm sorry, I'm wrong one. I'm quoting from Mike Bixler's deposition. He's on page 137. He says, I don't remember exactly the words the commissioners used, but to generalize, they were concerned about any impropriety outside the job that would hit the newspapers and give a negative connotation on the county that comma the department. He was made aware of this, but did he really need to be made aware that he put on notice that if you're arrested and incarcerated and charged with rape, that could have negative consequences on your position as the director of the human services organization that helps children and women in the county. Could he have any doubt that it's absurd that they're arguing that there is some notice requirements or that the employer failed to follow its progressive discipline policy? This kind of misconduct by it, that head honcho in this department, I mean, I follow that and I sympathize a lot with the county at the beginning of this. The question here is, in the end, the charges were dropped. It appears that, at least unless I've missed some stuff, that there was no evidence submitted that his problems were anything other than sleeping with people crazier than he was, for the old joke on that, so that the submission is that these were false charges and in the end he should have been taken back. Well, first of all, the question for this court is whether the commission, whether the employer acted with discriminatory animus when it terminated him, not whether or not the charges were false at that time, although that does come into play when he reapplied for his job. But let's look at, to answer your question, Your Honor, I think it's important for this court to be mindful of the explanation that Mr. Volz himself gave during his deposition about how he got into this position. Mr. Volz testified that he had to have sex with this woman, Stephanie Cotolupi, because in 2008, three years before this incident, she had falsely accused him of rape before. She filed a report, something he had never told the county until the date of his deposition, so well after he was terminated. He felt compelled to have sex with her whenever she so desired and did so for approximately three years. And why did he feel compelled? Again, his testimony is a little unbelievable, but it's not rebutted in the record. He said he felt compelled because if she filed another false charge of rape, that would jeopardize his job. He knew what situation he was putting himself into and showed an incredible lack of judgment by continuing this bizarre relationship, which is exactly the reason that justifies the commissioners not rehiring him, even though the charges were dismissed or dropped, recanted, if you will. So the employer acted completely appropriately, and more importantly, there's no evidence of discriminatory animus here. What about this cat's paw argument, which seems to be now mostly what the argument is? Right, they are really pointing the finger at Margaret Rudolph, and our position still is, and I understand, I read the Chapman case, our position still is that she was not his supervisor, she was on the same line as him, and the Chapman case is distinguished on its facts. I mean, there was evidence of significant discriminatory statements. You're not saying that there is not pretty good evidence that the board here relied upon her judgment and her in part rely on her, the board relied on the county administrator as well, the board also, as Judge Boggs pointed out, they're separate elected officials, and they're the ones who ultimately have to make an independent decision for themselves. They relied on her judgment, and she was biased, if that is the case, if that's the, then what's your response to that? Well, I certainly am not, I certainly, my first response is she wasn't his supervisor, so that would require an extension of Staub, but I certainly recognize the scenario under which somebody in her position could be the cat's paw, if you will. Usually in those, there's, for example, specialized knowledge that the cat has that says, well, I know that Sam did a bad thing, here I take it, the facts such as they were the next day, everybody had the same facts, pretty much. That's correct, and even though the meeting was only 10 minutes long, the county sheriff had contacted the county administrator, the county administrator had spoken individually with each commissioner the day before, they knew what was coming, and keep in mind, this was on the heels, the county administrator again is Bixler, Bixler, correct. Keep in mind, this was on the heels of what another police report that came out at the time that the investigation by Margaret Rudolph and the prosecutor's investigator Paul Schnitker completed that in January of 2011. About the same time, a Sandusky Register newspaper reporter called Pat Shenigo, one of the commissioners, and said, asked him, did you know that there was a criminal police report filed by Mr. Volz's girlfriend, not Ms. Volz, in 2010, a few weeks earlier? Mr. Shenigo and everybody else in the county was unaware of that. Mr. Shenigo intervened with the reporter and convinced him not to write the article. If Mr. Shenigo, who is one of the ultimate decision makers, had any discriminatory animus, that's not an act that makes any sense. Now I want to go back to the cat's paw theory though, on the Here are undisputed facts in the record. In 2007, Margaret Rudolph signed off on two promotions for the appellant as the HR director. In 2009, she was one of three people on a hiring committee, included her, Bixler, and Bill Monaghan, one of the commissioners, that unanimously recommended Mr. Volz for promotion. Now is this the set of events that your adversary was quoting with respect to, well, she was just the facilitator? I don't know if she was referring to that, because this is the assistant director position I'm talking about. The director position was in 2011, but it is pretty interesting that they are arguing downplaying her role in the work she did to be part of the unanimous recommendation for his promotion, and then point the finger and say, you had all this unbelievable influence over the county administrator of 30 years, and three county commissioners. Their argument is inconsistent. So in 2009, she makes that recommendation. Then in 2011, she is assigned to investigate this report that wasn't an anonymous complaint, but again, Judy Engelhardt, the director of the JFS at the time, is the one who said, I don't feel comfortable letting this go, and asked the prosecuting attorney's office to review that, those allegations, along with Margaret Rudolph. Sexual harassment complaint, we ought to look into it. Exactly. It can't be ignored, because it looked like it came from somebody internal, the way it was written. Margaret Rudolph, if she had discriminatory I think would have found a way to recommend discipline, but in January 2011, she doesn't recommend discipline. In May and June of 2011, she unanimously, along with Monaghan and Bixler, recommends Volts to be promoted to the director. So both of the promotions to assistant director and then to director were by the same committee, Rudolph, Bixler, and Monaghan? Judy Engelhardt in the first one in 2009, because she was the director at the time. Again, so she unanimously was part of the unanimous recommendation to promote him over a highly qualified Caucasian female, and for the assistant director and director position, both times Mr. Volts replaced Caucasian females. So the cat's paw doesn't even work here, and all of the claims, like the communication was bad, I mean that doesn't, there's no discriminatory animus in there, and even the estrogen comment is, first of all, the testimony Margaret Rudolph gave is, and I'm sorry I'm not going to remember the actual page of the deposition, was that this was to help Mr. Volts to let him know that his command presence as a police officer, and he served as an auxiliary police officer, won't work in an agency like that. There is no way that this court can take that one statement and say there's discriminatory animus. She didn't deny the general drift of it, suppose the difference between you can't survive if you keep doing that, as opposed to you're not going to survive, period. Did she, did they get into that? They did not get into that, but she does not deny making those kinds of statements as advice to Mr. Volts, and again, if that's evidence of discrimination, why did she not try to step in and prevent him from being promoted to director? That's January, then we're talking May when she recommended his promotion. You say the sole cause here ought to be under any objective review of this evidence, his conduct, in which he got in all this difficulty that was in the press, I suppose. Absolutely, and created a level of distrust. I want to just address in the couple minutes I have left, obviously any questions you have, but some of those arguments in the brief that the appellant raised about pretext. So the appellant has said that there were shifting rationales, the employer gave different reasons for the termination, but that's not the case here. What happened in this situation is sure, the commissioners and Margaret Rudolph and Mike Bixler didn't use the exact same words, but the district court correctly pointed out that they all related to the same underlying conduct, citing the Schoonmaker case, and it was the serious inappropriate acts by a director that caused distrust and unwanted publicity. This isn't the case of Griffin v. Finkbeiner that this court decided where first the employer said it was poor performance and then later said it was the person was terminated for a layoff due to lack of funds. Policy deviations, progressive discipline and the predisciplinary policies are mentioned. The progressive discipline policy doesn't mean you get a reprimand before a suspension, before a demotion, and then termination. It means the punishment has to fit the offense, and there is no way that this, and in order to in the context of this case, there has to be some discriminatory animus, not just that the employer might have used bad judgment, which we don't think they did, they did of course, in deciding to fire Mr. Voth for this reason. Despair treatment is one I really want to touch upon because there are many comparables, alleged comparables that the appellant tries to rely on, and these comparables are, these individuals are not comparable based on this court's prior decisions. First of all, none of them engaged in the same type of serious misconduct. Second of all, none of them were similarly situated in all relevant aspects of their jobs. There were five individuals in the Department of Job and Family Services that the appellant cited to as comparables. Again, none of them were arrested or charged with a crime or incarcerated, but all of these five individuals, pursuant to Ohio law 329.022, were classified civil service employees, and this court has decided in Russell v. Draybeck that classified employees under civil service are not comparable to unclassified employees. With respect to that, there's some discussion in the briefs about the fallback rights, and is the primary basis for which your side says that this was not a classified position that he started from as assistant director? Is this the January 12th resolution of the board establishing certain positions as exempt? Is that a resolution from 2011? Is that 09-11 at the top? This is January 12th. Yes, it's that. That is the primary one. That would be Monahan Exhibit 14 from his deposition. Right, and it has in it, assistant director is under attachment A. Right, and as you read that, the appellant is arguing that that just applied to Vicki Lyons, but that resolution refers to positions, not people. Position, title, and then present incumbent. Correct. So he was an unclassified employee and was not... Several of them are vacant, so under that theory, well, we couldn't apply to that position because there's no person in it, which... Correct, and under Ohio civil service law, it's generally speaking the position, not the person. Okay, I just want to make sure that I was on the right page. Absolutely, and a couple other points that I really want to just mention in my last few seconds. I would really ask the court to pay attention. I didn't address all of the alleged comparables, but again, none of them are comparative. One other department had from 1997, 14 years before Mr. Volz was terminated, and second of all, that same actor inference really does apply heavily in this case. Thank you. Counsel. Mr. Moran, you have your remaining time for rebuttal. Thank you, your honors. Obviously, I don't think I have enough time to address everything that counsel for the defendant's appellees... Get the most important... Reference, but I would like to discuss a few things. The first thing that I wanted to address is that counsel said that Mr. Volz's behavior as described in his deposition justified their failure to rehire him, but also said immediately preceding that, that the defendants didn't know about this until his deposition. So I guess I would ask... Know about this. Didn't know about this conduct that was described in Mr. Volz's deposition until he was deposed. So... I'm just missing this. What's the conduct in the deposition? Is the... The conduct that Mr. Volz described in his deposition. Counsel for defendants just said that that conduct justified the defendants... I didn't sort of hear that, hear it that way. Okay, we can look at... You're talking about the conduct with the woman, what's her name? Stephanie Cotolupi. That's the part you're talking about? Correct. Okay, the reasons, the reasons for it. And I guess the conduct of what happened, that is, that he went to Kelly's Island, came back, went to the one woman's house, then went to the other woman's house, that was known. You're saying it was the reason for the three years in between. Well... Mrs. Cotolupi. It's about his saying that he was afraid she would always get him in trouble if he didn't continue to sleep with her over all these years, right? That's what I'm referencing. Yeah, okay. And I guess this is in line with what the defendants have previously done in terms of shifting their explanations for what occurred. I know that counsel for defendants downplayed these shifts in explanations, but I think this is a really important point. The defendants claimed that Mr. Volz was terminated because he was arrested. That's what they stated in the unemployment submission to the Ohio Department of Job and Family Services. In April of 2012, the EEOC issued enforcement guidance saying that terminations based on arrests are discriminatory because arrests disparately impact certain protected groups. Counsel, I think what they're saying is that he brought public scorn or probably brought public scorn on the local government and on this aspect of it. Seems to be that's what they're saying. They charged him for it, right? That's what they're saying now, Your Honor, but that's not what they said initially to their submission to the ODJFS. And then when the EEOC issued enforcement guidance and the defendants had to respond to the EEOC charge that Mr. Volz fired, they said that he wasn't terminated. You think they're lying about that? Precisely because they say he was terminated not because of the arrest, but the conduct underlying the arrest as described in the police report. Every single member of the termination meeting admitted at their deposition that they didn't have the police report in the meeting. So that can't possibly be the justification for it. The defendants did lie to the EEOC about what happened here. I see that my time is up. Counsel? Well, you've got a lot of liars in this case, don't you? Everybody's accusing everybody of lying. Case will be submitted. Thank you. And the clerk may call.